CHRISTIAN SORENSON, Appellant, v. WRIGHT COUNTY et al.,
Appellees.

**DRAINS:**  Assessment of Benefits—Reduction of Assessments. Evi-
dence reviewed, and held that assessments made against land-
owner for the drainage ditch were inequitable, and should be re-
duced.

*Appeal from Wright District Court.*—R. M. WRIGHT, Judge.

MARCH 14, 1919.

APPEAL by plaintiff from an assessment of benefits re-
sulted in the dismissal of the petition, and plaintiff appeals.
—*Modified and affirmed.*

*Berry & Hill*, and *Nagle & Nagle*, for appellant.

*Birdsall, McGrath & Archerd*, for appellees.

LADD, C. J.—Drainage Ditch No. 19 had been estab-
lished with its southern boundary extending along the
north line of the northwest quarter of the northeast quarter
of Section 3 of Township 92 North, Range 24 West of the

5th P. M.  From near the northwest corner of this 40, the boundary extended in a northerly and northwesterly direction; and from near the northeast corner of said 40, said boundary extends northeasterly across the Minneapolis & St. Louis Railway, in the southwest corner of the southeast quarter of Section 26, in Township 93.  The outlet of this district consists of a tile drain, laid in a depression or creek, beginning about three miles north of the south boundary of District No. 19, where the tile emptied into said creek and flowed in a southwesterly and then easterly and southeasterly direction into the Iowa River, about two miles from the outlet of District No. 19.  A petition was filed, August 3, 1914, praying for the establishment of a district south of that above mentioned, and an engineer was appointed to survey and report upon the feasibility of establishing such a district, and of the construction of an improvement for the drainage thereof.  He reported favorably thereto, and his report, as subsequently amended, was adopted by the board of supervisors, and the drainage district duly established as No. 117, and the improvement constructed.  The area of the district thus established consisted of 2,532.92 acres, and included the following described lands of appellant, which were assessed for benefits by the board of supervisors as indicated:

| Description | Sec. | Twp. | Range | Acres | Amount |
|---|---|---|---|---|---|
| NE¼ NE¼ | 3 | 92 | 24 | 51 | $758.50 |
| NW¼ NE¼ | 3 | 92 | 24 | 49 | 920.72 |
| SW¼ NE¼ | 3 | 92 | 24 | 37 | 599.40 |
| NE¼ NW¼ | 3 | 92 | 24 | 22 | 366.25 |
| SE¼ NW¼ | 3 | 92 | 24 | 15 | 202.50 |

The owner had filed objections before the board of supervisors to the commissioners' report, and these were overruled.  He appealed to the district court, and, on hearing, the assessments as made by the board of supervisors were confirmed.

The improvement consisted of a tile main, extending from the Iowa River along the creek up to about 50 feet above the tile outlet of District No. 19, a distance of 14,200 feet, the tile being 36 inches in diameter at the river, and 26 inches at the junction with the outlet of District No. 19. There were six laterals, all short except No. 2, which was 11,000 feet in length. The tile main, as will be observed, carries the water gathered in the tile main of District No. 19, and the lands thereof were assessed in order to cover its portion of the expense, or $6,224.01. The sum of $18,117.99 was assessed against the lands of Drainage District No. 17, including those of appellant. About 2,000 feet of the 26-inch tile and 1,500 feet of the 28-inch tile were laid in the creek in appellant's land, and a lateral 10-inch tile, 300 feet long, lies wholly in one of the adjoining 40's. The purpose of this was to catch the water coming from the northeast. While the main drains the land within the creek's embankments, it is also valuable in furnishing an accessible outlet, which tends to enhance the value of the land beyond the banks of the creek. The banks of the stream as it enters appellant's land are well defined, estimated to be 12 or 15 feet above the bottom of the creek, and are high all the way through such land. The strip of land between them is drained by the improvement, and is from 12 or 14 to 150 feet wide, extending from near the northwest corner of the NW¼ of the NE¼ of Section 3, through its west line, then back in a southeasterly direction, then northeasterly into the 40 east, and then in a general southeasterly direction. Its area is estimated to be from 5 to 8 acres. Appellant estimated that about 8 or 10 acres in the northwest portion of his land, "along the road or the county line," were level, and required some drainage, and his son testified that, prior to the improvement, the "water didn't run over the banks of that defined channel, only when we had extra heavy rainfall;" that all

the land in the five 40's was tillable, except 4 or 5 acres in the hog pasture; that some surface water came from the land north, and some from that to the east.

Pritchard swore that the NE¼ of the NW¼ of Section 3 was high, dry land, with drainage toward the east; that the land of Sorenson is high, except where the ravine is, and there it was wet, but not swampy, and was easily drained.

Lynch thought that every part of the Sorenson land could be cultivated, except that along the creek.

It is apparent, from the evidence of the several witnesses, that the benefits derived from the improvement by the appellant's land, in addition to the drainage of the strip along the creek, are those of being furnished an outlet at a short distance into which to carry the water from about 8 or 10 acres near the north line and the 4 or 5 acres in the hog pasture and from the higher lands, which, competent authorities say, may be greatly benefited by tile drainage. The difficulty of measuring, with any degree of certainty, the money value of the benefits derived and to be derived from an improvement is apparent, and we shall not undertake such measurement. Section 1989-a12 of the Code Supplement, 1913, requires that the entire outlay in establishing the drainage district and constructing the improvement shall be apportioned equitably among the several tracts of land included in the district; and, therefore, the issues are whether this has been done, and if not, what changes should be made in the way of deductions from the assessments against appellant's land, to accomplish this purpose. These can only be ascertained from a comparison of the several tracts of land and the assessments levied against them. The evidence related to the land of but three persons other than appellant, and these may be set out, with name, location, acreage, and assessment:

| Name. | Description. | Section | Twp. | Acreage | Amount |
|-------|-------------|---------|------|---------|--------|
| E. Luick | SE NE | 2 | 92 | 35 | $1,180.60 |
| E. Luick | NE NE | 2 | 92 | 36 | 734.29 |
| J. H. Reese | SW NW | 35 | 93 | 31 | 649.43 |
| J. H. Reese | SE NW | 35 | 93 | 33 | 521.94 |
| J. H. Reese | NE SW | 35 | 93 | 36 | 442.70 |
| Aug. Hunst | NW SW | 35 | 93 | 37 | 639.36 |
| Aug. Hunst | SW SW | 35 | 93 | 39 | 639.36 |
| Aug. Hunst | SE SW | 35 | 93 | 39 | 442.70 |

Pritchard was familiar with the land of Luick, and testified that, prior to the establishment of the drainage district, the SE¼ NE¼ was mostly swamp.

"I don't know how many acres, but would say the principal part. I would say 30 acres of it was swamp. Taking the 40 acres just north of the one I have described, NE¼ NE¼ of Section 2,—that is partly low, swampy land, and some of it was dry. I should judge that about one half of that would be low and swampy, something like 20 acres. Q. How would the south tract of the E. Luick land compare with the NE NE of Section 3 of the Sorenson land? A. Well, there is no comparison. One is high, dry land, and the other is low, flat land."

The witness then explained that the south 40 of the Luick land is very level, low, and swampy, while the 40 of Sorenson's is quite high, except along the creek, but not swampy; that the wet land of Luick is marsh or swamp, and the dry land thereof is river bottom; that the N½ of the NE¼ of Section 3 beyond the creek's embankment is more level, and the water stands there longer, but may be readily drained into the outlet, though the areas requiring drainage are small; while Luick's 40's were about one half swampy, and untillable before the improvement was made.

Lynch's testimony tended to corroborate that of Pritchard, the former saying that the Luick land was "pretty wet * * * it was awful bad to do anything with

\* \* \* the wild hay was very nice" upon "the east side;" that he didn't know "whether there was much water standing upon that the greater part of the year;" that "it was all cut up with kind of ditches;" that "30 acres of the 80 could have been cultivated."

The Chicago Great Western Railroad Company's right of way extended diagonally over Luick's south 40 and the corner of the north 40, and this accounts in part for an area of only 35 acres in the SE¼ NE¼ of Section 2 and 36 acres in the NE¼ NE¼ thereof. The tile main passes over the land from east to west. A 350-foot 10-inch lateral connects with this main from the south, and Lateral 2 of 20-inch tile runs from the tile main north near the west line of the 40 and on near the west line of the north 40 a little more than half way, when it turns to the northwest.

It will be noted that Luick's south 40 has more tiling than any 40 belonging to appellant. The north 40 has less than either of the two 40's of the N½ of Section 3. Indeed, the system provided about the same amount of drainage for the two 80's. Luick's 80 contains 71 acres of land, and that of appellant, 174 acres, but there were swampy and marsh lands in Luick's 80 of about 50 acres; while in appellant's land, there were 5 to 8 acres along the creek bottom, and but 12 or 15 acres outside, requiring drainage. In other words, more than twice as much land in Luick's 80 required drainage as in the Sorenson 80. Moreover, the character of the land was such as to receive much greater benefit per acre than the Sorenson land. And yet, the assessment on the Luick land was nearly $27 per acre, while that against the entire body of Sorenson land was a trifle more than $16 per acre. We are of opinion that the assessment levied according to the benefits on appellant's land is proportionately much greater than that against the land of Luick, and that the record so demonstrates.

In comparing appellant's land with that of Hunst and Reese, it should be noted that Lateral 2 crosses the NE¼ of the S½ of the SW¼ of Section 35, belonging to Hunst, in a northeasterly direction through the NE¼ of said quarter section, across the southwest corner of the NW¼ of said section, over its west line, and then curving to the northeast, and following the ravine in a northeasterly direction. Pritchard testified that the SW¼ of the NW¼ was "mostly level and rather high," and that the drain ran along a ravine, which became more shallow toward the north; that, "before the water could escape from that land, it would have to go through this tile,—didn't get out naturally until the tile was constructed,—not only a small portion of it;" that the N½ of the NE¼ of Section 3 was very similar to this 80-acre tract of Reese's, "similar in lay of land and character of drainage that would be necessary." The witness thought the SE¼ of the SW¼ of Section 35 a little dryer than the Sorenson land, and that this 40, with the one west of it, belonging to Hunst, was very similar to the N½ of the NE¼ of Section 3, belonging to Sorenson, with the difference that the latter was a little nearer the outlet. He also thought that the S½ of the SW¼ of Section 35 was similar to the Sorenson land, above described.

Lynch considered "the east part of the Reese land pretty wet. It was flat. Water would stand on there part of the year in ponds, until it dried out." He declared that the north 40 of the Sorenson land was much better than the north 80 of the Reese land; that the Hunst land was "pretty wet, too wet land;" and that the Sorenson land "is lots the best. It is dryer and better in every way, and higher land. The drainage is about alike."

We are not persuaded that the difference in accessibility of Lateral 2 as an outlet for the drainage of the land in the SW¼ of Section 35 is enough to offset the difference

between the character of this land and that of Sorenson, and doubt whether the higher assessment of the S½ of the NW¼ of Section 35 is sufficient to offset the greater benefits received from the improvement over those enjoyed by appellant. The average assessment per acre on these six 40's of land seems much less proportionately than the assessments against the five 40's of Sorenson; while the assessments against Sorenson's 40's are out of all proportion, as compared with the assessments against Luick's 40's. After a most painstaking examination of the record, we have reached the conclusion that, to equalize the several assessments, those against the land of plaintiff should be reduced $4 per acre on each 40. The cause will be remanded, with direction that the decree be modified accordingly.—*Modified and affirmed.*

EVANS, PRESTON, and SALINGER, JJ., concur.